IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 13, 2010 Session

## STATE OF TENNESSEE v. MARIO A. REED

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40800325      John H. Gasaway, Judge**

_____

**No. M2009-00887-CCA-R3-CD - Filed August 31, 2010**

_____

A Montgomery County jury convicted the Defendant, Mario A. Reed, of aggravated burglary, two counts of aggravated rape, and theft under $500, and the trial court sentenced him to an effective sentence of forty years in the Tennessee Department of Correction. On appeal, the Defendant contends: (1) the juvenile court erred when it transferred his case to the circuit court for him to be tried as an adult; (2) the trial court erred when it instructed the jury on aggravated rape; and (3) the trial court erred when it sentenced him. After a thorough review of the record and applicable authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, delivered the opinion of the Court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Roger Nell, District Public Defender; Sarah R. King (on appeal) and Collier W. Goodlett (at trial), Assistant District Public Defenders, Clarksville, Tennessee, for the Appellant, Mario A. Reed.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Lacy Wilber, Assistant Attorney General; John W. Carney, Jr., District Attorney General; John Finklea and Art Bieber, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the rape of Army First Lieutenant L.S.[1] and an accompanying burglary. This case, as well as other cases against the Defendant, occurred when the Defendant was a juvenile.

## A. Juvenile Transfer Hearing

The State presented evidence to the juvenile court that the Defendant, who was seventeen at the time of these offenses, had also committed aggravated burglary, a class C felony, against another victim, Daniel Marquiese. The State requested that the juvenile court transfer the case to the circuit court, where the State sought to indict the Defendant on other offenses, including those involving the victim, L.S. At the hearing on this request, the juvenile court noted that the Defendant had undergone a mental evaluation and that the doctor performing the evaluation determined that the Defendant did not meet the criteria for commitability either voluntarily or involuntarily.

Daniel Marquiese, with the Alpha Company of the 101st Division Special Troops Battalion, testified at the transfer hearing that he lived in an apartment located at 135 Westfield Court, Clarksville, Tennessee with two roommates, Brent Dalton and John Lee. One day, he returned home from work and found a number of his possessions were missing. Marquiese noticed the front door to the apartment was dead bolted, but the back door was unlocked. He said he and his roommates never left either door unlocked, and it appeared that the burglar entered the apartment through a window. Marquiese said the intruder had stolen a handgun, a laptop computer, two watches, a camera, and a West Point 2005 class ring. Since the burglary, the watches and class ring were returned to him by the Clarksville Police Department. Marquiese said he did not know the Defendant and had not given the Defendant permission to enter his apartment.

On cross-examination, Marquiese said he was the last roommate to leave the apartment in the morning, and he specifically recalled locking both doors before leaving. He was unsure, however, whether the windows were all locked. The items taken were mostly in plain view, but the handgun was underneath the bed and the ring was in a case on a desk. Marquiese said he first realized something was wrong at the apartment when the front door was dead bolted. He explained that the dead bolt could only be locked from inside, and no one answered when he knocked on the door. He then went to the back door, which he found unlocked. Upon entering the apartment, he immediately noticed that his roommate's Playstation was missing, and he later noticed that several of his own items were also missing.

---

[1] In the victim's impact statement she states that one of her fears is that her friends and co-workers "would find out what happened." In respect of her privacy, and her fears that are a result of this attack, we will refer to her only by her initials.

On redirect examination, Marquiese testified he owned a Springfield XD tactical model handgun, and his roommate had a sub-compact model. He said neither of the guns were assigned by their military unit.

Detective Desmoine Chestnut testified he investigated a burglary at Park Place Apartments, for which the Defendant was a suspect and was in custody. Detective Chestnut explained that the officer who responded to the call about the Park Place burglary found the Defendant fleeing from the scene when he arrived. He apprehended the Defendant at the scene and took him into custody. The detective testified that the officer read the Defendant his rights, with both the Defendant's parents present, and then the Defendant's mother and step-father provided the detective permission to search the Defendant's room. In the Defendant's bedroom, the police found several watches, a West Point ring, two firearms, some sneakers that fit the shoe print of another burglary, i-Pods, an i-Pod base, cameras, and multiple other items the police suspected were stolen. Detective Chestnut testified he interviewed the Defendant, who confessed his complicity in these burglaries and told the detective where he could find the stolen property.

The juvenile court recognized that the Defendant had been adjudicated delinquent for aggravated sexual battery, theft of property, and evading arrest and was on probation from these crimes when he committed the crimes in this case. The court noted the Defendant was "previously committed by Juvenile Court for serious offenses, was committed to the State for treatment and was released by Circuit Court." The Juvenile Court then found "there is adequate probable cause to find that there was a burglary, this young man committed that burglary, and that he is not amenable to further treatment by Juvenile Court." The court then transferred the case to Circuit Court for the Defendant to be tried as an adult.

## B. Trial

After the Defendant's case was transferred to the Circuit Court for Montgomery County, the grand jury indicted the Defendant for one count of burglary, one count of theft of property valued over $500, two counts of aggravated burglary, two counts of aggravated rape, one count of theft of property valued under $500, and one count of theft of property valued over $1000. The trial court severed some of the counts, and a jury convicted the Defendant of aggravated burglary, two counts of aggravated rape, and theft of property valued under $500. The facts presented at trial supporting these convictions are as follows:[2]

_____

[2]Because the Defendant does not challenge the sufficiency of the evidence, the factual summary is
(continued...)

The victim, L.S. arrived at her apartment after work on December 13, 2007, at around 7:30 p.m. When the victim entered her apartment, she noticed that her front door was locked and her lights were on. She took off her boots, placed her keys on the key ring by her door, placed on the counter a twenty dollar bill and her debit card, both of which she retrieved from her pockets, and began making soup. The victim took a brief shower, dressed in a sweat suit hanging on the back of her bathroom door, went to the living room, and then entered her bedroom.

When the victim entered her bedroom, where her bedroom lights were on, a man pushed a black, automatic pistol toward her face, knocking her back, and told her he would shoot her if she screamed. The victim described the man as "heavier set" and noticed he was wearing blue pants with an orange stripe, a sweatshirt, and a black ski mask with slits in the eyes and mouth. The man told the victim to stand in the corner by her bed and to turn off the light on her way, and she complied with his orders. The man asked her where her money was located, and she told him on the counter, and the man went to the kitchen and retrieved her money and debit card. He returned and told the victim to disrobe, which she did. He then told her to get on her bed, and she complied. At this point, she noticed the man, who was still brandishing the gun, was wearing gloves.

The man then came toward the bed, lowered his pants slightly, and vaginally penetrated the victim. During this, the man pointed the gun at different places on the victim, either her face or up against her head. The man became angry at his inability to reach climax and, as a result, forced the victim to perform on him oral sex while he held the gun against her head. He told the victim that if he felt her teeth he would shoot her. The victim cooperated and told the man she would comply with his orders and asked him not to shoot her. The man again became angry, and he placed the victim on the bed with one of her legs over his shoulders and again vaginally penetrated her. He asked the victim if she "like[d] it," and, when she responded negatively, he hit her in the head with his gun and then stuck the gun in her mouth, telling her she "better start liking it." The man was still unable to reach climax and had the victim perform oral sex on him again.

After this, the victim's attacker told her to get in the shower. He stood outside the bathroom door with the gun pointed at her, telling her that he would shoot her if she screamed and ordering her to wash her vaginal area. The man asked her where her cell phone was located and then attempted unsuccessfully to find it. He repeatedly pointed the gun at her and asked her if she wanted to die. The man told the victim to open her

_____

(...continued)
presented in the light most favorable to the State.

refrigerator door, which she did, and he said, "[Y]ou ain't got shit in there." He then told her to open the door to the utility closet, which was located in the kitchen, and then to get inside the closet. This whole incident took between an hour and an hour-and-a-half.

The victim remained in the closet only briefly, and, when she exited, she noticed her front door was open and assumed the man was gone. She grabbed a robe that was lying on her table and left, running to other apartments trying to find someone at home. The victim ran to another building, and after knocking on the doors of several apartments, she finally found someone in an apartment.

The victim's assailant took several items from her home: a debit card; money; an i-Pod; two Sony cybershot cameras; an i-Pod docking station; a Fugi camera still in the box; a video i-Pod, also still in the box; a computer; and a cell phone. The victim intended to give the boxed items as Christmas gifts.

When police responded to the victim's call about her attack, they found dirty footprints on the floor and one dirty footprint on the bed. The victim's bedroom window screen had been cut and the screen was folded down. Detectives assumed this was the attacker's point of entry. Outside the apartment, police officers saw footprints containing a "tread" pattern in the mud outside the window and found a lock blade pocketknife lying open on the ground near the window. The footprints outside the victim's apartment went across the rear of the apartment toward a wooded area behind her apartment complex.

Officers developed the Defendant as a suspect in this burglary and rape. When they attempted to apprehend him at the scene of another burglary, he ran. Officers chased and caught the Defendant. The Defendant admitted that he had gone into the victim's apartment through her window and that he had taken items from her home, but he denied having sex with her. When officers searched the Defendant's room, they found a firearm matching the victim's description of the firearm used by her attacker, the victim's i-Pod and i-Pod case, the victim's i-Pod docking station, muddy sneakers, a cybershot camera, and blue sweat pants with an orange stripe. The victim later identified the cybershot camera, her i-Pod, and her i-Pod docking station in a picture of items police confiscated during their search of the Defendant's room. The tread of the muddy sneakers appeared to match the footprints found near the victim's apartment. Police also found in the Defendant's room a Glock pistol designed to fire a .40 Smith and Wesson cartridge.

The victim underwent an examination shortly after this attack, where samples were taken in an attempt to obtain a DNA profile of her attacker. During this examination, nurses found a one millimeter laceration surrounded by redness and swelling on the left side of the victim's head. Further, there were seven injuries to the victim's genital area: (1) a friction

injury similar to rug burn; (2) an entry injury; (3) irritation near the urinary output; (4) tenderness and swelling; (5) two linear lacerations, indicating tearing; (6) a nickel-sized abrasion; (7) an abrasion to the clitoral hood. These injuries were not consistent with consensual sexual intercourse. The samples taken during the victim's examination revealed the presence of the Defendant's DNA on the samples taken from inside the victim's vagina.

## C. Sentencing

At the sentencing hearing, the trial court admitted the Defendant's presentence report. The Defendant then testified that he was eighteen at the time of sentencing and seventeen at the time of these offenses. He acknowledged he had been adjudicated delinquent for assault in August of 2002, when he was eleven; theft of property and evading arrest in 2006, when he stole a BB gun from Walmart; and assault in May of 2007. The Defendant agreed he had also been adjudicated delinquent for another assault charge stemming from shooting a BB gun at a woman in a car. The Defendant denied he committed the shooting, saying that his female cousin actually shot the BB gun. He said he took the blame so his cousin would not get into trouble. The Defendant said in August of 2004 at age twelve he was adjudicated delinquent for aggravated sexual battery because he held a drill bit to a woman's throat and "felt on [her]." The Defendant said the court ordered him to see a psychologist, which he did for approximately two years. The Defendant recalled that, at one point, he was taken out of his parents' custody and placed in Middle Tennessee Mental Health Facility, where he learned that he had ADHD, for which he was on medication, and that he comprehended things more slowly than others. The Defendant said he had also been to three other facilities, Clarksville Treatment, Dogwood, and Binkley Group Home. The Defendant resided in Clarksville Treatment for two years.

The Defendant said, if the trial court sentenced him to shorter sentence, he would try to live with a family member and get his "act together." He anticipated receiving his high school diploma shortly, but he conceded that he did not have any job skills.

On cross-examination, the Defendant said he had a normal IQ and had been raised for the last couple of years in a nice home. He agreed that Dogwood was a facility for sex offenders that also offered anger management programs.

The trial court also considered the victim's impact statement in which she stated that she was afraid to be alone and lived in fear of people who fit the Defendant's description. She said she was scared of what lay behind closed doors and feared that her co-workers or friends would find out what had happened to her. She was also scared of the Defendant's family finding her or hurting her again.

After taking the case under advisement, the trial court sentenced the Defendant to five years for the aggravated burglary conviction, twenty years for each of the two aggravated rape convictions, and to 11 months and 29 days for the theft conviction. It ordered that the two aggravated rape sentences run consecutively to each other and that the rest of the sentences run concurrently with those, for an effective sentence of forty years, at 100%. We will discuss the trial court's other sentencing determinations below.

## II. Analysis

On appeal, the Defendant contends: (1) the juvenile court erred when it transferred his case to Circuit Court for him to be tried as an adult; (2) the trial court erred when it instructed the jury on aggravated rape; (3) the trial court erred when it sentenced him.

## A. Transfer from Juvenile Court to Circuit Court

The Defendant contends the juvenile court erred when it transferred his case from juvenile court to Circuit Court because: (1) he was not allowed to confront Dr. Janie Berryman at the hearing, in compliance with Tennessee Code Annotated section 37-1-126; (2) the trial court improperly admitted evidence seized from his bedroom because his mother's consent to search his room was not voluntary;[3] (3) there were not reasonable grounds for the trial court to find that the Defendant committed aggravated burglary; (4) there were not reasonable grounds to find that the Defendant was not committable to an institution for the developmentally disabled or mentally ill; (5) there were not reasonable grounds for the juvenile court to find that the interests of the community required that the Defendant be put under legal restraint or discipline; (6) the juvenile court did not properly consider the factors enumerated in Tennessee Code Annotated section 37-1-134(b); (7) the juvenile court improperly considered evidence of an unrelated charge; and (8) the juvenile court was not impartial. The State responds that the Defendant has waived objection to the admissibility of evidence introduced at the juvenile transfer hearing by failing to object contemporaneously at the hearing. Further, the State asserts that the record supports the juvenile court's decision.

The juvenile court has original jurisdiction over children who are alleged to be

---

[3]The Defendant at some points in his brief contends that the juvenile court also erred when it admitted his statements to police because, while his parents were present when he was interviewed, he was not properly given his *Miranda* warnings. The Defendant, however, later states "the Juvenile Court determined that the statements were inadmissible and . . . did not consider the statements in making its determination." The Defendant states, "We will accept the Juvenile Court at its word." We take this as an abandonment of this issue, and, therefore, we will not address it on appeal.

delinquent. T.C.A. § 37-1-134; *see also Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006). Tennessee Code Annotated section 37-1-134(a)(1)-(4) provides the circumstances under which a juvenile court shall transfer a juvenile accused of conduct that constitutes a criminal offense to Circuit Court to be tried as an adult. As relevant here, the juvenile must be at least sixteen years old at the time of the offense and be provided with notice and a hearing. T.C.A. § 37-1-134 (a)(1)-(3). A child charged with a criminal act is to be treated as an adult if the court finds that there are reasonable grounds to believe that: (1) the child committed the alleged delinquent act; (2) the child is not committable to an institution as retarded or mentally ill; and (3) the interests of the community require that the child be restrained or disciplined. T.C.A. § 37-1-134(a)(4)(A)-(C). In addition, § 37-1-134(b) lists a number of factors that the judge shall consider in deciding whether a juvenile should be treated as an adult. These factors include:

> (1) The extent and nature of the child's prior delinquency records;
>
> (2) The nature of past treatment efforts and the nature of the child's response thereto;
>
> (3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
>
> (4) Whether the offense was committed in an aggressive and premeditated manner;
>
> (5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and
>
> (6) whether the child's offense would be considered a criminal gang offense, as defined in § 40-35-121, if committed by an adult.

T.C.A. § 37-1-134(b)(1)-(6). This list is by no means exclusive. *State v. Cecil L. Groomes*, No. M1998-00122-CCA-R3-CD, 2000 WL 1133542, at *7 (Tenn. Crim. App., at Nashville, Aug. 10, 2000) (examining the 1996 version of this statute, which is substantially similar only differing from the current statute in that factor (6) has since been added by the Legislature), *no Tenn. R. App. P. 11 application filed.*

On appeal of an order of transfer from juvenile court, we do not decide where the preponderance of the evidence lies, but whether there were reasonable grounds for the juvenile court judge to believe that the three criteria of § 37-1-134(a)(4)(A)(C) mentioned above were present. *See State v. Strickland*, 532 S.W.2d 912, 920 (Tenn. 1975); *State v.*

*Layne*, 546 S.W.2d 220, 224 (Tenn. Ct. App. 1976). In other words, if there was probable cause to believe that the juvenile committed the crime and the evidence at the hearing showed that the defendant was not mentally impaired and should be legally restrained, a juvenile court judge's discretionary decision to allow a juvenile to be treated as an adult should not be disturbed on appeal. *See Groomes*, 2000 WL 1133542, at*7 (citing *State v. Orange*, 543 S.W.2d 344, 346-47 (Tenn. Ct. App. 1976)).

### 1. Waiver

The Defendant failed to appeal the juvenile court judge's transfer of his case to Circuit Court. Appeals from juvenile court are governed by Tennessee Code Annotated section 37-1-159. There is no civil or interlocutory appeal from a juvenile court's decision that a child should be dealt with as an adult in the criminal court. *State v. Griffin*, 914 S.W.2d 564, 566 (Tenn. Crim. App. 1995) (citing T.C.A. § 37-1-159(d)). If the juvenile court judge who presides over the transfer hearing is a lawyer, the statute does not provide for an acceptance hearing in criminal court, and the criminal court has no authority to decline jurisdiction. *Id.*; T.C.A. § 37-1-159(d) (stating that "[i]f and only if a nonlawyer judge presides at the transfer hearing in juvenile court, then the criminal court, upon motion of the child filed within ten (10) days of the juvenile court order . . . shall hold a hearing as expeditiously as possible to determine whether it will accept jurisdiction over the child"). Further, even if the judge presiding over the transfer hearing is a non-lawyer, if the child does not file a motion appealing the transfer hearing within ten days, "such child shall be subject to indictment, presentment or information for the offense charged and thus subject to trial as an adult." T.C.A. § 37-1-159(d). Section 37-1-159(d)'s elimination of the right to an acceptance hearing except where the transfer was by a non-lawyer judge does not violate due process. *State v. Darden*, 12 S.W.3d 455, 459-60 (Tenn. 2000).

The judge presiding over the Defendant's transfer hearing was the Honorable Wayne C. Shelton, a judge for Montgomery County General Sessions Court who is, in fact, a lawyer. In *Griffin*, this Court stated:

> If the juvenile judge who presides at the transfer hearing is a lawyer, the statute does not provide for an acceptance hearing in criminal court and apparently one cannot be held. Thus, it appears that the ruling of a lawyer juvenile judge is not reviewable by the criminal court and the criminal court has no alternative but to accept jurisdiction over the juvenile.

*Griffin*, 914 S.W.2d at 566. The *Griffin* court went on to state:

> Tennessee Code Annotated section 37-1-159 does not specifically address the

manner in which an appeal is taken from an order of a lawyer juvenile judge transferring a juvenile to be tried as an adult. When the transfer is made by a non-lawyer juvenile judge, the juvenile is entitled upon motion to an acceptance hearing in criminal court. The juvenile may appeal the order of the criminal court to this court following a conviction on the merits of the charge. We do not believe that the legislature intended for an order of a lawyer juvenile judge transferring a child to be tried as an adult to be unappealable and thus not subject to any review.

We note that the process of obtaining appellate review of a lawyer juvenile judge's order transferring a child to be tried as an adult is rather awkward. The criminal court has no authority to decline jurisdiction. Thus, the criminal court is put in a position of being forced to dispose of the case on the merits even though an appellate court must later determine whether the decision of the juvenile court transferring the child to the criminal court was correct. Thus, it appears that in order to review the decision of the lawyer juvenile judge, the juvenile in criminal court must either (1) enter a plea of not guilty and thus preserve the issue for review, if convicted, or (2) reserve the issue on a plea of guilty or nolo contendere pursuant to Rule 37(b)(2)(i) or (b)(2)(iv) of the Tennessee Rules of Criminal Procedure. The second alternative assumes that the decision of whether the juvenile should be tried as an adult is a "certified question of law" that may be appealed pursuant to Rule 37. *See State v. Kevin L. Moton*, No. 03C01-9104-CR-00129, *Hamilton County*, 1992 WL 19270 (Tenn. Crim. App., Knoxville, filed Feb. 6), *perm. to appeal denied*, (Tenn., June 22, 1992).

*Id.*

This case falls into the line of cases that the *Griffin* court identifies as "awkward." It is a case that requires appellate review of a lawyer juvenile judge's order transferring a child to be tried as an adult. The criminal court herein had no authority to decline jurisdiction, and it appropriately disposed of the case on its merits. The Defendant preserved for appeal our review of this case by pleading not guilty and being convicted. His failures to raise this issue before the trial court or to mention the issue in his motion for new trial do not preclude our review. We will, therefore, turn to address his contentions.

## 2. Confrontation of Dr. Janie Berryman

The Defendant first contends that he was not afforded the opportunity to confront Dr. Janie Berryman at the transfer hearing as guaranteed him by Tennessee Code Annotated

section 37-1-127. That Code section provides, "A party is entitled to the opportunity to introduce evidence and otherwise be heard in the party's own behalf and to cross-examine adverse witnesses." T.C.A. § 37-1-127. At the transfer hearing the following occurred:

> THE COURT: Request was made for said transfer December 28th, more than five days before this date. Request was made of . . . Dr. Janie Barr[y]man . . for a mental evaluation[.] . . . [A] letter dated January 10th of this year, that Mario Reed was referred for evaluation in accordance with TCA 37-1-134, specifically he was evaluated to determine whether or not he was committable to an institution for the developmentally disabled or mentally ill. After completion of said evaluation, Dr. Barr[y]man reports that she has found that Mr. Reed does not meet the criteria for committability voluntarily or involuntarily for the developmentally or mentally ill. So . . . [the Defendant] was seventeen at the time of the alleged offense. It appears to the Court. The State has appropriately requested this transfer hearing and he is not committable to an institution by virtue of mental illness or mental retardation. The alleged offense is a Class C Felony, aggravated burglary.
>
> Any other preliminary matters before we begin.
>
> GENERAL CLOUD: None that I know of, your Honor.
>
> THE COURT: [Defense Counsel], do you have any?
>
> [DEFENSE COUNSEL]: No, Your Honor.

The Tennessee Rules of Evidence govern all trials, including those held in juvenile courts. Tenn. R. Evid. 101 advisory comm'n cmts; *see also* Tenn. R. Juv. P. 28 (c). Tennessee Rule of Evidence 103 states that:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, *and*
>
> (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context; or
>
> (2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context.

Tenn. R. Evid. 103 (emphasis added).

The Defendant in this case made no objection to the admission of Dr. Berryman's letter, and he did not ask to cross-examine her. The record also does not indicate that he issued a supeona in order to ensure her presence at the hearing. Appellate relief is generally not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *see also State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Accordingly, we conclude the Defendant waived our review of this issue, and he is not entitled to relief.

### 3. Admissibility of Evidence

The Defendant next asserts that the juvenile court erred when it admitted evidence seized after his mother consented to a search of the Defendant's bedroom and vehicle because his mother's consent was not voluntary. The record from the juvenile hearing reflects that Detective Desmoine Chestnut was asked about the search of the Defendant's room. The detective explained that he asked the Defendant's mother and stepfather for permission to search the Defendant's room and vehicle, and he offered a copy of the document they executed granting him this permission. The detective said that, after he explained to the Defendant's parents his intentions, they were "extremely helpful." The officer then testified about the items he found during the search, some of which were stolen from Marquiese's apartment. On cross-examination, Detective Chestnut testified that he told the Defendant's mother that she did not have to grant him permission to search the Defendant's room and vehicle. He stated to her that, if she did not do so, he would seek, and likely obtain, a search warrant.

The Defendant made no objection to the admission of the evidence found during the search. Again, appellate relief is generally not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection).

Further, the record establishes that the Defendant's mother's consent was, in fact, voluntary. It is generally true that "[b]aseless threats to obtain a search warrant may render consent [to search] involuntary." *United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992);

*see also State v. Ashworth*, 3 S.W.3d 25, 30 (Tenn. Crim. App. 1999); *State v. David Ray Williams*, No. E2008-01045-CCA-R3-CD, 2009 WL 4878616, at *4 (Tenn. Crim. App., at Knoxville, Dec. 17, 2009), *no Tenn. R. App. P 11 application filed*. However, if the threat to obtain a search warrant is not baseless, that is, if police have probable cause to obtain a search warrant, the threat does not render consent to search involuntary. *See Williams*, 2009 WL 4878616 at *4 (citing *Simmons v. State*, 360 S.W.2d 10, 12 (Tenn. 1962)). In this case, the police had apprehended the Defendant fleeing from the scene of a burglary, and the police believed he had also committed other similar burglaries in the area. This provided the police sufficient probable cause to obtain a search warrant for the Defendant's bedroom. As such, we conclude that the evidence seized was properly considered by the juvenile court. The Defendant is not entitled to relief on this issue.

### 4. Reasonable Grounds

The Defendant next maintains that reasonable grounds did not exist for the juvenile court to conclude that he committed aggravated burglary. He bases his argument on the premise that the juvenile court did not consider his statement to police and that the evidence seized from his bedroom should be excluded. As articulated above, we conclude that the juvenile court properly considered the evidence seized from his bedroom.

In order to properly transfer the Defendant's case, the juvenile court was required to find "reasonable grounds to believe" that the juvenile committed the delinquent act as alleged existed. T.C.A. § 37-1-134 (a)(4)(A). While no definition of "reasonable grounds" is provided in the statute, the term has been used interchangeably with "probable cause" by the courts of this state. *See State v. Bowery*, 189 S.W.3d 240, 248 (Tenn. Crim. App. 2004) (discussing these terms in the context of the implied consent law) (citing *State v. Melson*, 638 S.W.2d 342, 350 (Tenn. 1982); *State v. Humphreys*, 70 S.W.3d 752, 761 (Tenn. Crim. App. 2001); *see also State v. Lewis*, 36 S.W.3d 88, 97 (Tenn. Crim. App. 2000) (holding that "[p]robable cause is 'a reasonable grounds for suspicion, supported by circumstances indicative of an illegal act.'"); *Groomes*, 2000 WL 1133542, at*7 (stating that a juvenile court must determine at a transfer hearing whether "there was probable cause to believe that the juvenile committed the crime . . . ."); *State v. Freddie Morrow and Damien Darden*, No. 01C01-9612-CC-00512, 1998 WL 917802, at *5 (Tenn. Crim. App., at Nashville, Dec. 22, 1998) (referring to the "reasonable grounds" determination in the context of a juvenile transfer hearing as the "probable cause" determination), *perm. app. dismissed* (Tenn. May 15, 2000). So the question before us is whether the juvenile court correctly determined that there existed "reasonable grounds" or "probable cause" that the Defendant committed the aggravated burglary of Marquiese.

Aggravated burglary is defined in relevant part as entering a habitation without the

effective consent of the owner and with the intent to commit a felony, theft, or assault. T.C.A. §§ 39-14-402(a)(1), -403(a). The evidence presented at the juvenile transfer hearing proved that someone entered Marquiese's apartment, a habitation, through a window and stole a handgun, a laptop computer, two watches, a camera, and a West Point 2005 class ring. Police attempted to apprehend the Defendant when they responded to a call about another burglary, and the Defendant fled from the scene of that burglary when police arrived. After they eventually apprehended the Defendant, police obtained permission from the Defendant's parents to search the Defendant's room. In the room, the police found several watches, Marquiese's West Point ring, two firearms, some sneakers that fit the shoe print found at the scene of another burglary, i-Pods, an i-Pod base, cameras, and multiple other items the police suspected were stolen. Based upon this evidence, the juvenile court found "there [wa]s adequate probable cause to find that there was a burglary, this young man committed that burglary, and that he is not amenable to further treatment by Juvenile Court." We conclude the trial court did not err in this regard. The evidence presented at the juvenile hearing provided reasonable grounds to believe the Defendant had committed aggravated burglary.

### 5. Legal Restraint or Discipline

The Defendant next contends that the juvenile court erred when it concluded that he was "not committable to an institution for the mentally retarded or mentally ill." T.C.A. § 37-1-134(a)(4)(B). He asserts first that Dr. Berryman, who performed his mental evaluation, is not competent to conduct such an examination. Further, he asserts that her report did not include necessary information from which the juvenile court could conclude he is not commitable. Again, the Defendant in this case made no objection to the admission of Dr. Berryman's letter, and he never alerted the juvenile court to his assertion that the letter was inadequate. After the juvenile court read Dr. Berryman's findings aloud in court, it asked the Defendant's counsel whether he had any other preliminary matters. Counsel replied negatively, never raising any issue about Dr. Berryman's credentials or her report. Appellate relief is generally not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *see also State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Accordingly, we conclude the Defendant waived our review of this issue, and he is not entitled to relief.

### 6. Community Interests

The Defendant contends that the trial court erred when it determined that the community's interests require legal restraint or discipline of the juvenile. T.C.A. § 37-1-

134(a)(4)(B)(C). The Defendant asserts the State introduced no evidence from which the juvenile court could conclude that he was required to be put under legal restraint or discipline. The Rules of Appellate Procedure require that citations to authority and references to the record be included in the argument portion of the brief. Tenn. R. App. P. 27(a)(7). The Defendant's brief contains no citations to authority or to the record. The rules of this court direct waiver of issues not supported by citation to authorities or appropriate references to the record. *See* Tenn. R. Ct. Crim. App. 10(b). Therefore, we treat this issue as waived.

### 7. Consideration of T.C.A. § 37-1-134(b) Factors

The Defendant asserts that the juvenile court did not properly consider the six factors required in determining juvenile transfer and enumerated in Tennessee Code Annotated section 37-1-134(b)(1)-(6). He asserts that the juvenile court's findings of fact are insufficient. The record clearly supports the juvenile court's finding in light of these six enumerated factors. The written order of the juvenile court indicates that it considered these factors, and the record supports that the factors weigh in favor of transferring the Defendant to Circuit Court. The juvenile court considered the extent and nature of the child's prior delinquency records, including that the Defendant had previously been convicted of aggravated sexual battery, theft, evading arrest, and assault. *See* T.C.A. § 37-1-134(b)(1). When examining the nature of past treatment efforts and the nature of the child's response thereto, the juvenile judge was presented evidence that the Defendant had been to juvenile detention, including mental treatment facilities, and had violated his probation on one prior occasion. *See* T.C.A. § 37-1-134(b)(2). The Defendant was charged with aggravated burglary, which, was not in the case transferred a crime against a person, but the juvenile court was aware he was also facing other charges, including a charge of rape, a crime against a person. *See* T.C.A. § 37-1-134(b)(3). The offense was committed in an aggressive and premeditated manner, considering that the items seized in the Defendant's room were from multiple burglaries, one of which also involved a rape. *See* T.C.A. § 37-1-134(b)(4). Finally, we agree with the juvenile court that the Defendant's potential for rehabilitation was poor in light of his prolonged and recent treatment for an aggravated sexual battery conviction and his subsequent violation of his probation. T.C.A. § 37-1-134(b)(5). This offense was not one that would be considered a criminal gang offense as defined in section 40-35-121, if committed by an adult. T.C.A. § 37-1-134(b)(5). After considering these factors, we conclude they support the juvenile court's transferring of the Defendant to Circuit Court. The Defendant is not entitled to relief on this issue.

### 8. Evidence of Unrelated Charge

The Defendant next asserts that the juvenile court improperly considered evidence of

his alleged aggravated burglary and rape of victim L.S. He notes that the juvenile court asked, "Was the rape supposedly the same day too?" When defense counsel objected, stating that those charges were not part of the transfer hearing, the juvenile court acknowledged as much, but said he was curious. Later in the hearing, a detective testified that on an unknown date an unnamed victim was raped, and the detective believed the Defendant had been involved. Later in the hearing, the juvenile judge stated that the Defendant would face additional charges, including aggravated rape and burglary, if he were transferred to Circuit Court. This, the Defendant says, was an improper consideration by the juvenile court.

As previously stated, the juvenile judge shall consider several factors in deciding whether a juvenile should be treated as an adult. T.C.A. § 37-1-134(b)(1)-(6). These factors relate to the interests of the community and whether the juvenile is amenable to treatment or rehabilitation through juvenile court rather than restraint or punishment meted out through the adult court, and include: (1) The extent and nature of the child's prior delinquency records; (2) The nature of past treatment efforts and the nature of the child's response thereto; (3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person; (4) Whether the offense was committed in an aggressive and premeditated manner; and (5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state. T.C.A. § 37-1-134(b)(1)-(5). Again, this list is by no means exclusive. *See Groomes*, 2000 WL 1133542, at *7.

We conclude that, while not specifically enumerated in the list of statutory factors a juvenile court shall consider when deciding whether to transfer a juvenile to Circuit Court, a juvenile's continual accruing of charges involving serious criminal offenses, including aggravated rape and other crimes against a person, is relevant to many of the enumerated factors in the statute. First, it shows the juvenile's amenability to treatment and rehabilitation, especially in this case where the Defendant had previously been adjudicated guilty of, and received treatment for, committing a sexual offense. Second, in this case, the Defendant's rape charge was relevant to his possible rehabilitation by use of procedures, services and facilities currently available to the court in this state in that he had previously been adjudicated guilty of a sexual offense as a juvenile and the juvenile court had exhausted its procedures to rehabilitate the Defendant, who then violated his probation by being charged with multiple burglaries and an aggravated rape. We conclude the fact that the Defendant's being a suspect in several other serious criminal offenses was relevant to his amenability to treatment and rehabilitation. Therefore, the Defendant is not entitled to relief on this issue.

## 9. Impartiality of Juvenile Court

Finally, the Defendant contends that the juvenile court was not impartial because the juvenile court influenced the District Attorney's decision to request a transfer. Also, he notes that there was a news article in the juvenile court's file about a juvenile who had been arrested for burglary and was a suspect in a rape, although the article did not identify the Defendant by name. We conclude that the Defendant has not shown that the juvenile court was impartial. After our thorough review of the record, we note that the juvenile court conducted the hearing in a professional manner and made the proper considerations when transferring the Defendant's case to Circuit Court. This issue has no merit.

## B. Aggravated Rape Jury Instruction

The Defendant contends that the trial court erred when it instructed the jury on aggravated rape because it told the jury that it could find the Defendant guilty of aggravated rape if it found he acted recklessly. The Defendant makes no citations to the record to support his contention. The Rules of Appellate Procedure require that citations to authority and references to the record be included in the argument portion of the brief. Tenn. R. App. P. 27(a)(7). The rules of this Court direct waiver of issues not supported by citation to authorities or appropriate references to the record. *See* Tenn. R. Ct. Crim. App. 10(b). Therefore, this issue should be treated as waived.

Further, the Defendant failed to include the jury instructions in the appellate record. When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate, and complete account of what transpired with respect to the issues forming the basis of the appeal. *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn 1993) (citing *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983)). Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue. *Id*. at 561 (citing *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988)). Absent the necessary relevant material in the record an appellate court cannot consider the merits of an issue. *See* Tenn. R. App. P. 24(b).

Moreover, in the absence of a record to review "the appellate court must conclusively presume that the ruling of the trial judge was correct, the evidence was sufficient to support the defendant's conviction, or the defendant received a fair and impartial trial." *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990); *see also State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Accordingly, the Defendant's failure to include a copy of the jury instructions results in waiver of any challenge to the trial court's instructions. *See Ballard*, 855 S.W.2d at 560-61; *Draper*, 800 S.W.2d at 493. He is not entitled to relief on this issue.

## C. Sentencing

The Defendant, a Range I standard offender, was convicted of two counts of aggravated rape, a class A felony, one count of aggravated burglary, a class C felony, and theft of property valued under $500.00, a class A misdemeanor. For the Defendant, a class A felony has a range of punishment between fifteen and twenty-five years. *See* T.C.A. § 40-35-112(a)(1). A class C felony has a range of punishment of three to six years. *See* T.C.A. § 40-35-112(a)(3). And the class A misdemeanor carries a sentence up to eleven months twenty-nine days. T.C.A. § 39-13-103 (b). The trial court sentenced the Defendant to twenty years for each of the class A felony convictions, which Tennessee Code Annotated section 40-35-501(I) mandates must be served at 100%. The trial court ordered the Defendant to serve five years for the aggravated burglary conviction and eleven months and twenty-nine days for the theft conviction. The trial court ordered the two twenty-year sentences to run consecutively to each other and the other two sentences to run concurrently to these, for an effective sentence of forty years.

The Defendant contends that the trial court erred when it sentenced him because it: (1) improperly applied two enhancement factors; (2) refused to apply one applicable mitigating factor; and (3) improperly imposed consecutive sentences.

When a defendant challenges the length, range, or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). The burden is on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, *Sentencing Comm'n Cmts* (2006). This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration and proper weight to the factors and principles relevant to sentencing under the Sentencing Act, Tennessee Code Annotated section 40-35-103 (2006), the appellate court may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the

parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 4-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2006); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). We must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2006).

## 1. Enhancement Factors

The Defendant contends the trial court misapplied two enhancement factors: (1) that he treated the victim with exceptional cruelty pursuant to Tennessee Code Annotated section 40-35-114(5); and (2) that he committed this offense when the risk to human life was high.

The Criminal Sentencing Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2) and (d) (2006); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). If an enhancement factor is not already an essential element of the offense and is appropriate for the offense, then a court may consider the enhancement factor in its length of sentence determination. T.C.A. § 40-35-114 (2006). In order to ensure "fair and consistent sentencing," the trial court must "place on the record" what, if any, enhancement and mitigating factors it considered as well as its "reasons for the sentence." T.C.A. § 40-35-210(e). Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors it found to apply to the defendant. T.C.A. § 40-35-401(b)(2) (2003). The 2005 amendments deleted as grounds for appeal, however, a claim that the trial court did not properly weigh the enhancement and mitigating factors. See 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. In summary, although this Court cannot review a trial court's weighing of enhancement factors, we can review the trial court's application of those enhancement factors. T.C.A. § 40-35-401(d) (2006); *See Carter*, 254 S.W.3d at 343.

### a. Exceptional Cruelty

The trial court enhanced the Defendant's sentence to twenty years, based in part on enhancement factor (5), that the Defendant treated the victim with exceptional cruelty. T.C.A. § 40-35-114(5). In support of this finding, the trial court stated, "[T]he defendant treated the victim with exceptional cruelty during the commission of the offense of aggravated rape in that he struck the victim in the head without reason and taunted the victim

by repeatedly asking her if she wanted to live."

As our Supreme Court has explained:

> [P]roper application of enhancement factor (5) requires a finding of cruelty under the statute "over and above" what is required to sustain a conviction for an offense. *See State v. Embry*, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995); *see also Poole*, 945 S.W.2d at 98 (requiring the facts in a case to "support a finding of 'exceptional cruelty' that demonstrates a culpability distinct from and appreciably greater than that incident to" the crime). In other words, such evidence must "denote[ ] the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." *State v. Haynes*, No. W1999-01485-CCA-R3-CD, 2000 WL 298744, at *3 (Tenn. Crim. App. filed at Jackson, Mar. 14, 2000).

*State v. Arnett*, 49 S.W.3d 250, 258-59 (Tenn.2001). This Court has found applicable the exceptional cruelty enhancement factor when the defendant taunted the victim, shot the victim deliberately, placed a gun to her head, and tried to humiliate her and make her cry. *State v. Tony Von Carruthers*, No. 02C019102CR00019, 1991 WL 147946, at *1 (Tenn. Crim. App., at Jackson, Aug. 7, 1991), *no Tenn. R. App. P. 11 application filed*; cf. *State v. Quinton Cage*, No. 01C01-9605-CC-00179, 1999 WL 30595, at *10 (Tenn. Crim. App., Nashville, Jan. 26, 1999), perm app. denied, (Tenn. July 12, 1999) (holding "[a] threat of the victim being shot is inherent in the offense of an especially aggravated kidnapping that is committed by the use of a firearm.").

We conclude that the trial court did not err when it applied enhancement factor (5). The evidence supports that, while the Defendant was repeatedly raping the victim, he asked her whether or not she wanted to die. He also asked if she liked being raped by him, and, when she answered negatively, he hit her on the head with the end of the gun. This evidence supports the trial court's application of this enhancement factor.

### b. Risk to Human Life

The Defendant next contends that the trial court erred when it found applicable enhancement factor (10), that the defendant had no hesitation about committing the offense of aggravated rape when the risk to human life was high. T.C.A. § 40-35-114(10). Enhancement factor (10) applies where the defendant "had no hesitation about committing a crime when the risk to human life was high." T.C.A. § 40-35-114(10). In general, factor (10) applies only where the facts that establish that the defendant created a high risk to

human life also demonstrate a greater culpability than that incident to the offense underlying the enhancement. *State v. Jones*, 883 S.W.2d 597, 601 (Tenn. 1994). As a result, where a high risk to human life is inherent in the underlying conviction, enhancement factor (10) applies only if the defendant disregarded a high risk to the life of a person other than the victim. *State v. Zonge*, 973 S.W.2d 250, 259 (Tenn. Crim. App. 1997). This Court has previously addressed whether this factor can be applicable to an aggravated rape conviction, stating:

> In *Claybrooks*, 910 S.W.2d at 872, our Court concluded that every robbery accomplished with a weapon necessarily entailed a high risk to human life as well as the risk of bodily harm. Accordingly, those factors were not proper enhancers. *Id.* Under the rule announced in *Claybrooks*, we must conclude that when a rape is aggravated because of the use of a weapon, risk to human life and the risk of bodily harm are inherent in the crime.

*State v. Antonio M. Byrd*, No. 02C01-9508-CR-00232, 1997 WL 1235 (Tenn. Crim. App., at Jackson, Jan. 2, 1997), *perm. app. denied* (Tenn. Sept. 22, 1997).

The trial court made the following comments regarding the applicability of enhancement factor (10): "[T]he defendant kept his handgun trained on the victim for over an hour and at one point hit the victim in the head with the gun evidencing a conscious lack of concern for the foreseeable consequence of the gun discharging and the victim being killed." We cannot agree with the trial court's application of this enhancement factor to the Defendant's sentences. This case is one in which risk to human life is inherent in the crime by the Defendant's use of the weapon. However, in light of the other two applicable enhancement factors, that the Defendant has a previous history of criminal behavior and that he treated the victim with exceptional cruelty during the commission of this offense, we deem it unnecessary to modify the Defendant's sentence.

### 2. Mitigating Factor

The Defendant contends that the trial court erred when it refused to find his youth as a mitigating factor. About this, the trial court stated,

> The court specifically rejects the defendant's contention that the defendant lacked substantial judgment in committing the offenses because of his youth. The defendant exercised substantial judgment in both the planning and implementation of the offenses. This was not the act of an immature, impulsive youngster. He assembled a knife to facilitate his entry and a gun for both force and coercion. He waited for the victim to come home giving him

ample time to use reflection and judgment about his intended behavior.

In considering whether a defendant lacked substantial judgment because of his youth, chronological age is not determinative. *State v. Charles Justin Osborne*, No. 01C01-9806-CC-00246, 1999 WL 298220, at *4 (Tenn. Crim. App., at Nashville, May 12, 1999) (citing *State v. Antonio D. Mason*, No. 01C01-9607-CC-00315 (Tenn. Crim. App., at Nashville, Oct. 24, 1997)). Rather, we are directed to "consider the concept of youth in context, i.e., the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct." *Id*. (citing *State v. Adams*, 864 S.W.2d 31, 33 (Tenn.1993)).

The Defendant was seventeen years of age at the time of his offenses, and he relies entirely on his age to support applicability of this factor. He offers absolutely no other evidence or argument, and we find nothing in the record from which we might infer a lack of substantial judgment. The trial court properly rejected this mitigating factor based upon its findings. The Defendant is not entitled to relief on this issue.

### 3. Consecutive Sentencing

The trial court sentenced the Defendant to twenty years for each of his aggravated rape convictions, five years for the aggravated burglary conviction, and eleven months and twenty-nine days for the theft conviction. The trial court ordered these two rape sentences to run consecutively to each other and the other sentences for the other two convictions to run concurrently to these, for a total effective sentence of forty years. The Defendant contends the trial court erred when it imposed consecutive sentences because both rapes arose "from one continuous encounter."

When it ordered the sentences to run consecutively, the trial court found:

> The court has considered the provisions of Tenn. Code Ann. § 40-35-115 and finds by a preponderance of the evidence that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. Moreover, the court finds by a preponderance of the evidence that (a) the commission of the aggravated rapes were surrounded by aggravating circumstances, (b) confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life and the defendant's resort to criminal activity in furtherance of an anti-social lifestyle, and (c) the aggregate length of the sentences reasonably relates to the

offenses of which the defendant stands convicted.

It is within the sound discretion of the trial court whether or not an offender should be sentenced consecutively or concurrently. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of seven listed factors exists. These factors include factor (4), that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). The trial court's finding that the Defendant is a "dangerous offender" by itself is insufficient to support consecutive sentences. In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), our Supreme Court set forth additional requirements for consecutive sentences when the defendant is a "dangerous offender." In order to base consecutive sentencing on the dangerous offender category, the trial court must find: (1) that the term imposed "is necessary to protect the public from further criminal acts by the offender;" and (2) "that the terms imposed are reasonably related to the severity of the offenses committed." *Id*. at 938. The requirement of additional findings when the defendant is a "dangerous offender" "arises from the fact that of all of the categories for consecutive sentencing, the dangerous offender category is the most subjective and hardest to apply." *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). The other categories for consecutive sentencing have "self-contained limits;" thus, the additional findings are limited to cases involving consecutive sentencing of "dangerous offenders." *Id*.

The evidence supports the trial court's imposition of consecutive sentences. The evidence proved that the Defendant, who had committed other burglaries, cut the victim's screen and entered her bedroom. He waited there until she returned from work, prepared her dinner, and took a brief shower. When she went to her bedroom, he pushed her back and placed a gun in her face, telling her he would shoot her if she screamed. He then raped her. When he was unable to climax, he forced her to perform oral sex. He repeatedly asked the victim if she wanted to live. The Defendant, still unable to climax, again raped the victim, asking her if she "liked" it. When she said that she did not, he hit her in the head with his gun. The Defendant, in an attempt to avoid being identified, forced the victim into the shower at gunpoint and pointed the gun at her genitalia, instructing her to wash her genitalia. The Defendant then forced the victim into a small closet, where he left her. This evidence supports the trial court's finding that consecutive sentencing is necessary to protect the public and that the sentence is reasonably related to the seriousness of the harm. The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and the applicable authorities, we affirm the

judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE